UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CORI L. NUSBAUM,

Plaintiff,

v.

ENLIGHTEN FAMILY CHIROPRACTIC, LLC, ET AL.,

Defendants.
______________________________/

Case No. 19-cv-10223

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' OMNIBUS MOTION IN LIMINE [ECF NO. 92]**

## I. Introduction

On January 23, 2019, Plaintiff Cori Nusbaum filed a complaint in Michigan State court against Defendants Enlighten Family Chiropractic, LLC ("Enlighten"), and Trisha Ann Ambroski ("Dr. Ambroski"), jointly and severally. Defendants properly removed the lawsuit to this Court. The complaint alleges five causes of action: vicarious liability for medical error (Count I), professional negligence (Count II), gross negligence (Count III), res ipsa loquitur (Count IV), and professional negligence/failure to timely refer for treatment (Count V). Plaintiff seeks damages in the amount of $10 million.

Before the Court is Defendants' omnibus motion in limine filed on October 11, 2022. Plaintiff responded on October 19, 2022, and Defendant replied on October 24, 2022. The motion is fully briefed and the Court heard oral argument on January 17, 2023. Contained within Defendants' omnibus motion are 15 motions in limine. Five of those motions have been resolved by stipulation. The remaining motions are listed below.

For the reasons mentioned below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**:

**No. 1:** Motion to Preclude Evidence of Claims for Lost Wages and/or Loss of Earning Capacity is **DENIED IN PART AND GRANTED IN PART.**

**Nos. 3-5 and 9:**

- Defendants' Motion to Exclude Causation Testimony of Plaintiff's Expert Robert E. Lee ("Dr. Lee") is **DENIED**

- Defendants Motion to Exclude Causation testimony of Chitra Venkatasurbramanianm ("Dr. Venkat") is **DENIED**

- Defendants' motion to exclude causation opinion of Alan Bragman ("Dr. Bragman") (5) is **GRANTED**.

- Defendants' motion no. 9 to exclude Gerald Shiener ("Dr. Shiener") is **GRANTED IN PART AND DENIED IN PART.**

**Nos. 7-8, 10, and 12**:

- Defendant Motion in limine No. 7 is **GRANTED IN PART and DENIED IN PART**;
- Defendants Motion in limine No. 8 is **GRANTED**;
- Defendant Motion in limine No. 10 is **GRANTED**

- Defendant's Motion in limine no. 12 is **GRANTED**.

## II. Factual Background

This lawsuit arises out of the doctor-patient relationship between Ms. Nusbaum and Dr. Ambroski. Plaintiff received chiropractic care from Dr. Ambroski on two occassions. During the first visit, she presented with a headache and neckpain. Dr. Ambroski performed a chiropractic technique known as a "cervical manipulation," after which Plaintiff says her symptoms improved. During the second visit, however, Plaintiff says Dr. Ambroski perform a second cervical manipulation with "violent force."

Dr. Amborski provided medical care to Ms. Nusbaum at Enlighten Family Chiropractic in her capacity as a chiropractor and employee of Enlighten.

Plaintiff says Dr. Ambroski used a combination of chiropractic techniques involving spinal manipulation and head movements during her second visit that caused a blunt injury to her cervical spine and a traumatic vertebral artery dissection ("VAD"). [ECF No. 1, PageID.4]. Nusbaum claims she subsequently developed numbness in her face, right sided "paresthesias", severe headaches and facial weakness, drooling from the right side of her mouth, numbness in the right side of her body, as well as right-sided weakness. [Id].

Nusbaum went to ProMedica Bay Park Hospital in Ohio on July 31, 2016, where she underwent a CT scan of the head and a CT angiogram of the head and the neck. The results revealed evidence of large vessel occlusion. She was then transferred to ProMedica Toledo Hospital and started having more right-sided weakness and "hemisensory" loss as well as "ataxia" in her right upper extremity. [Id]. Nusbaum alleges that further investigation by the hospital revealed that she had a right vertebral artery dissection, a right medullary cerebrovascular accident ("CVA"), i.e. stroke, and "Brown-Séquard syndrome" secondary to post-traumatic VAD.

She was then transferred and admitted to ProMedica Flower Hospital Campus-Rehabilitation Unit. She stayed there from August 4, 2016, to August 20, 2016 for rehabilitation therapy.

## III. Defendants' Motions in Limine Nos. 2, 11, 13-15

Defendants say that, pursuant to the parties' October 11, 2022 discussion, under L.R. 7.1 they stipulate to the following: (1) evidence of previous claims against Enlighten is excluded; (2) evidence relating to insurance coverage is excluded; (3) Plaintiff will only introduce medical expenses in the amount actually paid; (4) evidence of what healthcare personnel would have personally done in this

case is excluded; and (5) neither party will offer evidence as to prior malpractice suits. [ECF No. 92, PageID.4342, 4353-54].

## IV. Defendants Motions in Limine No. 1, and Nos. 3-5

### A. Motion in Limine 1: Defendants' Motion to Preclude Evidence of Claims for Lost Wages and/or Loss of Earning Capacity.

The first issue pertains to Plaintiff's claims for lost wages and loss of earning capacity. Defendants seek to remove those claims from trial because Plaintiff failed to provide updated earning statements and wage related evidence to supplement the 2014 tax records she produced to Defendants in discovery. [ECF No. 92, PageID.4359]. Defendants further argue that no testimony from an economist or vocational rehabilitation expert showing Plaintiff's inability to earn a living or that there has been any impact of her earnings. They assert that existing evidence does not show Plaintiff's lost wages or earning capacity. [Id].

In a medical malpractice action, the trier of fact must divide an award of damages into past economic, past noneconomic, future economic, and future noneconomic losses. See MCL 600.1483(2); *Taylor v. Kent Radiology*, 286 Mich. App. 490, 519 (2009).

Michigan courts look to MCL 600.2945(c) for its definition of economic losses for medical malpractice cases: “objectively verifiable pecuniary damages arising from ... loss of wages, loss of future earnings ... or other objectively verifiable monetary losses.” *Hannay v. Dep't of Transp.,* 497 Mich. 45, 80-82, (2014); *Zehel v. Nugent*, 2022 WL 17365602, at *5 (Mich. Ct. App. Dec. 1, 2022).

The general rule is that “remote, contingent, and speculative damages cannot be recovered in Michigan in a tort action.” *Health Call of Detroit v Atrium Home & Health Care Servs., Inc*., 268 Mich App 83, 96 (2005). Although the amount of damages calculated by the jury “may only be an approximation, it is sufficient if a reasonable basis for computation exists.” *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc*., 268 Mich. App. 83, 96, 706 N.W.2d 843, 852 (2005). Jurors are permitted “to weigh the evidence in view of their common knowledge or experience.” *Est. of Langell by Touma v. McLaren Port Huron*, 2020 WL 4382791, at *5 (Mich. Ct. App. July 30, 2020) (*citing People v. Bailey*, 310 Mich. App. 703, 722; 873 N.W.2d 855 (2015).

Plaintiff testified about her amount in present and future lost wages. Under Fed. R. Civ. P. 701, if a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to

determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge.

It is true that Plaintiff has no expert testimony on her lost wages. But that does not make her claims for lost wages and lost earning capacity speculative.

As the Michigan court of appeals has stated, a claim for loss of earning capacity damages is inherently speculative by its nature. *Johnson v. Henry Ford Hosp*., 2005 WL 658820, at *7 (Mich. Ct. App. Mar. 22, 2005). Every loss of earning capacity claim "is unique, as are the proofs required in each case." *Id*. "For example, the evidence presented for an infant's loss of earning capacity claim is very different than what is presented for the claim of a middleaged practicing surgeon." *Id*. Nevertheless, each plaintiff is entitled to recover if they can prove that their loss will occur to a reasonable degree of certainty as a result of the injury suffered." *Id.* at *6. Age, gender, race, occupation, experience, education, locality, and level of impairment are just a few of the variables to be considered in determining loss of earning capacity. *Id*.

Plaintiff attended community college, and works as a server, manager, and bartender at a restaurant. She testified that in 2015, she made $20,714.81. That number dropped to $12,362.76 in 2016 – the year Plaintiff was treated by Dr.

Amborski. [ECF No. 94-2, PageID.5180]. Her income dropped by $8,352.05 in 2016.

Plaintiff also says her wages do not account for 90% of the tips, or the additional side jobs, that she worked nearly every Friday before she was injured. [ECF No. 94-2, PageID.5180]. Although Plaintiff's tips vary greatly throughout the year, she testified that on a typical Friday night, she would make anywhere from about $100.00 to $300.00. [ECF No. 94-2, PageID.5181]. She has worked in various roles as a server, bartender, and manager. Plaintiff testified that her total income was $17,405.57 in 2017 and 17,818.10 in 2018. [ECF No. 94-2, PageID.5181]. Lastly, she asserts that she was never able to perform side jobs again because of her condition. [ECF No. 94, PageID.5123]. That seems to be true at least up until 2019 when Plaintiff made $21,856.38 and in 2020 she made $45,449.42. She is employed at KeyBank but did not produce documentation for 2021.

Defendants advance no argument for why documents or experts are necessary for the jury to determine her diminution in salary between 2015-2016 or the amount of money she will make in the future. *See Lessard v. Whittemore*, 2019 WL 4180170, at *5 (Mich. Ct. App. Sept. 3, 2019) (reversing the trial court's grant of summary disposition with respect to plaintiff's claim for lost wages and ruling that plaintiff "did not need documentary evidence [to prove lost wages], as his proffered

testimony established that he had a business and made approximately $300 per week from that business prior to the accident. The fact that plaintiff never filed any tax documents nor made any filing with the state regarding his business would not preclude a finding that he actually engaged in this business"). *See also McDowell v. Livonia Hotel Bus., Inc.*, 2022 WL 2916675, at *13 (E.D. Mich. July 25, 2022) (holding that plaintiffs' testimony regarding their annual salaries and symptoms of PTSD were sufficient to submit present and future lost wages to the jury).

Further, Defendants can cite no authority showing that Plaintiff is required to have an expert to prove present and future economic damages and lost earning capacity. Plaintiff's testimony about her income and her inability to do side jobs after her treatment with Dr. Ambroski is reasonably certain enough to support her claims. Plaintiff's testimony is based on her rational perception, it is helpful to the jury in determining her economic damages, and it is based on her own observations and experience; it is not based on specialized knowledge.

It is true however, the record shows that any diminution in her income was cured by 2019 when her salary went back up to $21,856.38 and when it increased again in 2020 to $45,449.42. This clearly indicates that Plaintiff does not have lost wages beyond 2019.

Defendants also claim plaintiff is not entitled to recover past economic damages because she already recovered all her lost wages from a Go Fund Me fundraiser. [ECF No. 94-2, PageID.5211].

Under Michigan's "one recovery rule" "[g]enerally . . .only one recovery is allowed for an injury." *Grace v. Grace*, 253 Mich. App. 357, 368, 655 N.W.2d 595, 602 (2002). That rule mandates that when "a recovery is obtained for any injury identical with another in nature, time, and place, that recovery must be deducted from the plaintiff's other award." *Id.* at 369, 655 N.W.2d at 602. The "one recovery rule"—also known as the "setoff" rule—which generally governed the relationship of joint tortfeasors to a plaintiff but it also addresses a plaintiff's right to recover for a single injury from multiple sources, regardless of whether the defendants are jointly liable. *K.S. v. Detroit Pub. Sch*., 153 F. Supp. 3d 970, 979 (E.D. Mich. 2015).

The Court need not decide at this juncture whether the one recovery rule applies to preclude the jury from considering Plaintiff's past lost wages. MCL 600.6303 allows for "reduction" of a verdict for economic damages for payment made by a collateral source. Benefits from a collateral source are not considered payable or receivable by a plaintiff until the court determines that there is a previously existing contractual or statutory obligation on the part of the collateral source to pay the benefits. MCL 600.6303 (5).

The people who contributed to Plaintiff's Go Fund Me page were likely under no legal or contractual obligation to do so, thus, the collateral source rule likely does not apply to Plaintiff's Go Fund Me proceeds. Even if it did, however, the statute mandates that evidence to establish that damages were paid by a collateral source is only admissible to the court in *after* a verdict for the plaintiff is rendered and before a judgment is entered on the verdict. *Id*. at (1) (emphasis added).

Plaintiff cannot be precluded from asserting her economic damages before the jury because her testimony and other evidence in the record provides them with a reasonable basis to compute damages. However, Plaintiff's claim for damages for lost tips will be limited to $100 a week for the 6 months she was unable to perform side jobs. Further, Plaintiff is precluded from claiming lost wages for 2019- present.

Defendants' motion in limine no. 1 is **DENIED IN PART AND GRANTED IN PART**.

**B. Motions in Limine Nos. 3-5 and 9: Defendants' Motion to Exclude Causation Testimony of Plaintiff's Experts Robert E. Lee, Chitra Venkatasurbramanianm, Alan Bragman, and Gerald Shiener**.

Defendants move to exclude causation testimony from three of Plaintiff's expert witnesses: Drs. Robert E. Lee, Chitra Venkatasurbramanianm, and Alan Bragman. They claim the expert opinions are not reliable or helpful to the fact finder

and thus do not satisfy Fed. R. Evid. 702 or *Daubert v. Merrell Dow Pharmaceuticals*., 509 U.S. 579 (1993).

**(1) Standard of Review**

Fed. R. Evid. 702 governs the admissibility of expert testimony. A party offering an expert's opinion bears the burden of establishing the admissibility of such opinion by a preponderance of the evidence. *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 344, 251 (6th Cir. 2001). Expert testimony is admissible only if it satisfies the requirements of Rule 702 of the Federal Rules of Evidence, which states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods, and;

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The district court must also determine whether the expert's testimony meets three requirements: (1) the expert witness must be qualified by "knowledge, skill, experience, training or education," (2) the proffered testimony is relevant and "will assist the trier of fact to understand the evidence or to determine a fact in issue," and (3) the testimony is reliable in that it is based on scientific, technical or other specialized knowledge. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008).

In *Daubert*, the U.S. Supreme Court held that Fed. R. Evid. 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony ... is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 594, (1993). District Courts have considerable discretion in determining the reliability of an expert's testimony under *Daubert. Davison v. Cole Sewell Corp.,* 231 Fed.Appx. 444, 448 (6th Cir.2007).

The standard to exclude an expert's testimony under *Daubert* is high, and "rejection of expert testimony is the exception, rather than the rule." *Keyes v. Ocwen Loan Servicing, LLC,* 335 F. Supp. 3d 951, 956 (E.D. Mich. 2018); *Innovation Ventures, L.L.C. v. Custom Nutrition Labs., L.L.C*., 520 F. Supp.3d 872, 877 (E.D.

Mich. 2021) (citing *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 530 (6th Cir. 2008)); *Kamp v. FMC Corp*., 241 F. Supp. 2d 760, 761 (E.D. Mich. 2002) (citing notes to Rule 702) ("[T]he trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system."). If there is a reasonable factual basis for expert testimony, it should be admitted. *See Keyes*, 335 F. Supp. 3d at 956 (citing Rule 702; *United States v. L.E. Cooke Co*., 991 F.2d 336, 342 (6th Cir. 1993)).

Additionally, it is important to distinguish between genuine questions of reliability and questions of credibility and accuracy. *In re Scrap Metal*, 527 F.3d at 529–30. Any issue regarding the credibility or accuracy of admitted expert testimony goes not to the admissibility of the evidence, but to the weight of the evidence, and can be addressed via cross-examination and "presentation of contrary evidence" by opposing counsel. *Id*. at 532 (quoting *Daubert v. Merrell Dow Pharms*., 509 U.S. 570, 596 (1993)).

Daubert listed four non exhaustive factors for the Court to consider in its reliability determination, no one factor is individually binding. *Davison*, 31 Fed.Appx. at 448. These factors include:

(1) Rate of error: known or potential rate of error of the technique or theory when applied.

(2) Existence and maintenance of standards and controls concerning the operation of the technique or theory.

(3) Acceptance: whether the technique or theory has been generally accepted in the scientific community.

(4) Technique or theory subject to peer review: whether the technique or theory has been subject to peer review and publication.

*Daubert*, 509 U.S. at 592–95.

The *Daubert* factors are not meant to be requirements in every case; instead, they should be applied only where they are reasonable measures of the reliability of expert testimony. *Dixon v. Grand Trunk W. R.R. Co.*, 259 F. Supp. 3d 702 (E.D. Mich. 2016). Since all the expert opinions used a methodology that required them to "rule out" potential causes of Plaintiff's VAD other than cervical manipulation, the Court believes a discussion regarding whether this particular methodology is reliable in the medical profession is more helpful than an exhaustive factor-by-factor analysis of the *Daubert* factors.

**(2) Motions in Limine No. 3 to Exclude Dr. Lee's Expert Causation Opinions**

Defendants claim Dr. Lee is unqualified, because he has not treated a patient since December 2014, less than a year before Plaintiff's injury. He has never trained as a chiropractor or performed a chiropractic adjustment, he never researched or published on the relationship between chiropractic adjustments and dissection, and any outside articles he could use to establish his foundational knowledge in this area are missing. [ECF No. 92, PageID.4362].

Dr. Lee is a licensed vascular surgeon who opined that chiropractic manipulation traumatizes the vertebral artery, which can result in a stroke. [ECF No. 94-7, PageID.5309]. His deposition testimony is summarized in an Affidavit of Merit ("AOM"); it describes Plaintiff's lack of previous health issues, the location of Plaintiff's VAD, its symptoms, the risk factors for stroke Plaintiff developed after her time with Dr. Ambroski, and he explains that Dr. Ambroski caused Plaintiff's VAD. [Id. at PageID.5311]. Dr. Lee cited scholarly medical literature to support his opinions as well.

A close look at Dr. Lee's background reveals that he is qualified as a medical expert. He has been a medical doctor for more than 15 years, focusing his scholarly work, teaching, and professional practice almost exclusively in the realm of vascular health, arterial function, medical imaging/testing, comprehensive care, diagnosis, and treatment of vascular injuries. He wrote a book chapter on vertebral artery reconstruction, which is a treatment that many patients pursue after vertebral artery dissection and stroke. [ECF No. 94-5, PageID.5263]. Dr. Lee is clearly qualified by "knowledge, skill, experience, training [and] education." his proffered testimony on causation is relevant and will assist the trier of fact to understand the evidence and determine liability with respect to causation. Fed. R. Evid. 702.

Defendants argue that Dr. Lee's methodology is unreliable because he extrapolated scientific principles from the three articles he cited and applied those principles to the facts. [ECF No.94, PageID.5124]. They claim that close examination of the literature and facts Dr. Lee relies on do not establish causation.

The first article Dr. Lee relied on is entitled, *Cervical Arterial Dissections and the Association with Cervical Manipulative Therapy*, Jose Biller et al., (Oct. 2014). Defendants say it is unreliable because the article suggests only a "possible association" between chiropractic adjustments and VAD because "causation is difficult to determine" and the probability of VAD occurring due to chiropractic adjustments is "low". [ECF No. 94-8, PageID.5318].

Defendants make the same argument about the second article entitled, *Current Understanding of the Relationship between Cervical Manipulation and Stroke: What does it Mean for the Chiropractic Profession*, Donald Murphy, (2010). Defendants add that it forcefully refutes Dr. Lee's opinion. [ECF No. 92, PageID.4364]. That article concludes that there is "no strong foundation for a causal relationship" between chiropractic adjustments and VAD but that patients "often have initial symptoms which cause them to seek care from a chiropractic physician and have a stroke sometime after, independent of the chiropractic visit." [ECF No. 92, PageID.4364]. The third article Dr. Lee relied on concludes: "there is no convincing

evidence to support a causal link between chiropractic manipulation and VAD." [ECF No. 92, PageID.4365].

As Dr. Lee testified, scientific literature establishes that VAD can be caused by any minor trauma, health issues affecting the cervical spine, or even mundane daily activities. [ECF No. 94-6, PageID.5289]. He also stated that:

> spontaneous dissections that occur without apparent cause, and if somebody coughs and has a spontaneous dissection, you can make the case that the cough caused it, but there's not the strong type of relationship that some epidemiologic studies have shown between chiropractic manipulation and vertebral dissections.

[Id].

According to the literature cited by Dr. Lee, many patients develop symptoms of VAD prior to visiting a chiropractor and then more severe VAD symptoms emerge after chiropractic care, such as a stroke. In these situations, the articles discussed above conclude that it is unclear whether the escalating VAD symptoms that occur after chiropractic manipulation are due to preexisting VAD in these patients or due to trauma caused by chiropractic manipulation. [ECF No. 94-8, PageID.5314]. None of the articles purport to establish as a matter of scientific consensus, that VAD cannot be caused by chiropractic adjustments.

Dr. Lee's observations of Plaintiff's circumstances, medical history, CT scans, symptoms before and after chiropractic care, and other tests, formulate the

basis of his opinion that Dr. Ambroski caused Plaintiff's VAD. This was based on her being young and healthy "with no history of any cervical spine trauma, arteriopathies, autoimmune disorders, uncontrolled hypertension, or other identifiable risk factors." [ECF No. 94-7, PageID.5310]. Despite there being no risk factors, she presented to Dr. Ambroski with headaches and neck pain twice. After the first treatment she says her symptoms improved. After the second treatment—during which Plaintiff alleges that Dr. Ambroski applied "violent force"—she had a stroke. [Id]. She visited two hospitals and had medical imagining tests done; they both revealed that she had a VAD and stroke caused by trauma to her cervical spine. [Id].

Dr. Lee concluded that Dr. Ambroski caused the trauma that resulted in Plaintiff's VAD. [ECF No.]. He ruled out other potential causes of Plaintiff's VAD based on her good medical history, lack of intervening traumatic events, and his evaluation of her symptoms and tests after she treated with Dr. Ambroski.

Dr. Lee's "rule out" methodology is reliable. It is based on this case's facts and data. This methodology is similar to "differential diagnosis," which assists doctors in forming expert opinions on medical causation. *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 178 (6th Cir. 2009). "[I]t is the method by which a physician determines what disease process caused a patient's symptoms; the

physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." *Id*. "It is an appropriate method for making an expert determination of medical causation for an individual instance of disease." *Id*.

A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor: (1) objectively ascertains, to the extent possible, the nature of the patient's injury, (2) "rules in" one or more causes of the injury using a valid methodology, and (3) engages in "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a conclusion as to which cause is most likely. *Id*. at 179.

In connection with the third "rules out" prong, if the doctor "engage [s] in very few standard diagnostic techniques by which doctors normally rule out alternative causes," the doctor must offer a "good explanation as to why his or her conclusion remain[s] reliable." *Id*. Similarly, the doctor must provide a reasonable explanation as to why "he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause." *Best*, 563 F.3d at 180.

In Dr. Lee's view of Plaintiff's condition and the CT scans showing a VAD, Plaintiff had only one VAD risk factor: the history of cervical spine manipulation by a chiropractor, Dr. Amborski. [ECF No. 94-6, PageID.5303]. And while the

scientific literature concludes that there is only an association between chiropractic manipulation and VAD, it does not rule out chiropractic manipulation as a cause of VAD.

Believing that other potential triggers for Plaintiff's VAD were absent, Dr. Lee concluded: "I believe the dissection occurred at the time of the forceful manipulation, and then by the time she was admitted to the hospital, she had clear-cut evidence of a fixed neurologic deficit." [Id. at PageID.5303]. His methods and expert opinion are reasonable, if the VAD did not occur until the time of the forceful manipulation, then a jury could reasonably conclude that the forceful manipulation caused the VAD.

Defendants' argument goes mostly to the credibility and accuracy of Dr. Lee's opinion. When an expert opines that the cause of an injury lies with a particular source, "[t]he fact that several possible causes might remain uneliminated only goes to the accuracy of the conclusion, not to the soundness of the methodology." *In re: E. I. Du Pont De Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728 (S.D. Ohio 2015). As stated by the Sixth Circuit, any issue regarding the credibility or accuracy of expert testimony goes not to the admissibility of the evidence, but to the weight of the evidence, and can be addressed via cross-examination and

"presentation of contrary evidence" by opposing counsel. *In re Scrap Metal*, 527 F.3d at 532.

Motion in Limine No. 3 is **DENIED**.

**(3) Motion In Limine No. 4: Dr. Venkat's Expert Opinion**

Defendants' arguments for excluding the expert Dr. Venkat's expert opinion pertain to the credibility of her opinions concluding there can be a causal link between VAD and chiropractic manipulations. The Court will discuss whether it is admissible.

Dr. Venkat is a clinical professor of Neurology and Neurosurgery at Stanford University Medical Center. She holds a medical degree in Internal Medicine, among others. She is a licensed medical doctor. [ECF No. 94-9, PageID.5353]. As a board-certified vascular neurologist, she has cared for patients who have suffered stroke due to chiropractic care and has lectured on the topic of vertebral artery dissection and its association with chiropractic care. [ECF No. 94, PageID.5162]. She testified that the majority of the patients she treats are those "who have vertebral artery dissections and have had strokes." [ECF No. 98-2, PageID.5871]. Dr. Venkat has practiced in this field of medical expertise for over two decades. She has experience in diagnosis and treatment of VAD and strokes. [Id. at PageID.5873]. Dr. Venkat is

qualified by knowledge, skill, experience, training, and education to opine on the cause of a patient's VAD and stroke.

Dr. Venkat relied on her training, education, experience, and knowledge of the scientific literature, medical records, and Plaintiff's imaging studies, to conclude that Plaintiff's VAD and subsequent stroke were caused by Dr. Amborski's chiropractic care.

Dr. Venkat stated in her deposition that, in her experience, she has seen VAD cases with a wide range of causes, including chiropractic manipulation, activities where you have to frequently turn your neck, sports, motor vehicle accidents, attempted suicide by hanging, and autoerotic asphyxiation. [ECF No. 98-2, PageID.5881].

Dr. Venkat admitted in her deposition that, "as an academic physician, I'm very well aware of all the literature that's out there pertaining to this topic. So I didn't do any specific research for this." [ECF No. 98-2, PageID.5880].

According to Dr. Venkat, Plaintiff did not have prior mechanical triggers, prior cervical trauma, or prior cervical triggers before she received chiropractic care from Dr. Ambroski and Plaintiff reported "a very violent manipulation of her neck" by Dr. Amroski during the second chiropractic adjustment. [Id]. Dr. Venkat ruled out other possible causes of Plaintiff's VAD and concluded that cervical

manipulation were the sole cause. [Id]. She based her opinion partly on the fact that Plaintiff was examined by a multitude of physicians at two hospitals and "not a single mechanical trigger, other than the chiropractic manipulation that she had a few days before she presented with the stroke, was identified by any of the physicians that were taking care of her." [ECF No. 98-2, PageID.5888].

Plaintiff appeared for two chiropractic manipulations with Dr. Ambroski. Dr. Venkat considered the fact the Plaintiff presented to Dr. Ambroski for the first chiropractic adjustment with headaches and neck pain, she worked multiple jobs, and a variety of things could have caused her to have a VAD. Dr. Venkat observed that after the first chiropractic adjustment, Plaintiff's symptoms improved. [ECF No. 98-2, PageID.5887]. After the second adjustment, Plaintiff had a VAD and stroke. [Id].

This led Dr. Venkat to conclude that Plaintiff did not have VAD before the first adjustment stating that:

> if the neck pain is because of a dissection, there is no way that a chiropractic manipulation is going to relieve it because it's not a mechanical problem. It's an actual tear in the artery's wall, and you don't expect that pain to be resolved by a chiropractic manipulation. So I would absolutely disagree that Ms. Nusbaum presented to the chiropractor with a dissection.

[ECF No. 98-2, PageID.5887].

Dr. Venkat also agreed that edema of the cervical spine is evidence of an external traumatic force having been applied to the spine. [Id. at PageID.5895]. Plaintiff's x-ray showed edema "very close to the levels where the manipulation was actually performed." [Id. at PageID.5895]. And she testified that edema could be caused by the manipulation performed by Dr. Ambroski. [Id].

It is true that Plaintiff's radiologist raised a question about facet arthritis being the cause of Plaintiff's edema. However, according to Dr. Venkat, Ms. Nusbaum had an X-ray of her spine done before she started the chiropractic manipulations. In looking at that X-ray and the testimony of Dr. Amborski, Dr. Venkat opined that both of them agree that there was no evidence of arthritis on that X-ray. [Id]. Similarly, if there was any concern for arthritis, Dr. Venkat testified that "she would expect it to be equally distributed on both sides [of her body] and not just a unilateral one." [Id]. Dr. Venkat stated, "[s]o for all of those reasons I would be highly concerned that the presence of the soft tissue edema on the right side at the level of manipulation due to chiropractic manipulation." [Id]. She concluded that chiropractic manipulation caused Plaintiff's VAD, and she rules out other potential causes.

Pursuant to *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 178-179 (6th Cir. 2009), Dr. Venkat's technique: (1) objectively ascertained the nature of the

patient's injury by reviewing medical records and x-rays, (2) "rules in" chiropractic care as the cause using her experience, medical records, patient's statements, x-rays, and edema levels as data, (3) engages in "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a conclusion as to which cause is most likely. And she offers a reasonable explanation for why her opinion is reliable, because, based on the research other neurologists have done in the literature on the relationship between chiropractic care and arterial function, chiropractic care can cause trauma to the cervical spine that results in VAD and ultimately a stroke.

Defendants argue that Dr. Venkat's expert opinion is unreliable because she did not rely on peer-reviewed scientific literature. Her opinion is not unreliable just because she relied on her internal knowledge, experience, and scientific test results rather than outside scholarly research. *See Envt'l Dev. Ltd. P'ship v. Envirotest Sys. Corp*., 478 F.Supp.2d 963, 976 (N.D. Ohio 2007) ("[A]n expert's testimony may be formulated by the use of the facts, data, and conclusions of other experts."); and *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed.Cir.2008) ("[N]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts."); *see also Huskey v. Ethicon, Inc.,* 29 F. Supp. 3d 691, 722 (S.D.W. Va. 2014) (holding urologist's opinions were not "unreliable simply because he relied on internal Ethicon

documents" instead of medical literature for his opinion that a method of implanting medical devices increased the risk of health complications).

"Experts are permitted wide latitude in formulating their opinions." *Daubert*, 509 U.S. at 592. Courts frequently have pointed to an expert's reliance on the reports of others as an indication that their testimony is reliable. *Walker v. Soo Line R. Co*., 208 F.3d 581, 588 (7th Cir. 2000) (collecting cases). "[W]hen an expert relies on the opinion of another, such reliance goes to the weight, not to the admissibility of the expert's opinion." *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co*., 240 F.3d 1, 9 (1st Cir.2001)

Dr. Venkat's opinion is reliable, based on sufficient facts and data applied to reliable scientific principles and methods. Her methodology satisfies Fed. R. Evid. 702, and *Daubert*. To the extent Defendants wish to exclude Dr. Venkat's opinion due to a lack of credibility, the credibility of Dr. Venkat's expert opinion is a question the jury must decide.

For these reasons, Defendants' motion in limine no. 4 is **DENIED**.

**(4) Defendants' Motion in Limine No. 5 to Dr. Bragman's Expert Opinion as to Causation**

Dr. Bragman's opinion is similar to those of Dr. Lee and Dr. Venkat; he concludes that Dr. Ambroski's cervical manipulation caused Plaintiff's VAD.

Defendants argue that Dr. Bragman is not qualified to render causation opinions because the issues in this case involve medical issues outside the scope of his chiropractic knowledge. They also assert that his opinions are unreliable because he fails to produce any literature to support his opinions as to causation. [ECF No. ]. Dr. Bragman based his causation link between VAD and chiropractic manipulation on his experience and several scholarly articles.

Dr. Bragman is a Doctor of Chiropractic who was licensed in or around 1982. He splits his time between testifying as an expert witness in civil litigation, and his chiropractic practice. He is not a medical doctor. He has no experience in neurology. His practice does not include the treatment or diagnosis of vascular injuries, he would refer those things to a specialist. [ECF No. 94-12, PageID.5445]. He admits to having done no independent research or testing regarding the theory that cervical manipulative therapy causes vertebral artery dissection. [Id. at PageID.5444]. Dr. Bragman is "not a specialist in any field that specializes in the diagnosis and treatment of vertebral artery dissection." [ECF No. 94-12, PageID.5445]. He did not treat or examine Plaintiff. And he does not interpret MRI's or vascular studies. [Id]. [ECF No. 94-12, PageID.5440]. However, Dr. Bragman has testified in over 100 cases involving vascular injury.

Dr. Bragman also opines on the applicable standard of care in Michigan. However, Defendants' do not move to exclude those opinions; they challenge Dr. Bragman's qualifications as they pertain to his causation opinion.

Dr. Bragman has interacted with patients with vascular injuries, he has testified in cases with causes of action pertaining to vascular injuries, and he has reviewed articles about the association between vascular injuries and chiropractic care. But he has not diagnosed or treated patients with vascular injuries. He is not an expert in vascular injuries.

Cases in the Sixth Circuit applying Fed. R. Evid. 702 and Daubert are instructive on this point. For example, in *Rose v. Truck Centers, Inc*, a truck mechanic—who was a certified master technician and oversaw repair and maintenance of mechanical systems of automobile, heavy truck and trailer fleets—was not qualified as an expert witness on issues of product defect and causation. *Id*. The products liability action involved claims against the manufacturer of steering gear used in a tractor-trailer single vehicle accident. *Rose v. Truck Centers, Inc*., 611 F. Supp. 2d 745, 750 (N.D. Ohio 2009), aff'd, 388 F. App'x 528 (6th Cir. 2010). The Court held that the mechanic's testimony exceeded the field of maintenance, as he had not designed or manufactured a steering gear for a truck and did not demonstrate

that he knew more about mechanical engineering principles than an average juror. *Id*.

Similarly, in *Elswick v. Nichols*, 144 F.Supp.2d 758 (E.D.Ky.2001), the court excluded the testimony of an expert in the field of nursing. The plaintiff in that medical malpractice case developed a post-operative infection during his recovery at a hospital. *Id*. At trial, plaintiff offered the testimony of an expert in the field of nursing care, which included testimony about a nurse's standard of care for post-operative patients, as well as "her opinion [that] the index of suspicion is very high that this breach led to this man developing the nosocomial [i.e., hospital acquired] infection." *Id*. at 766 (internal quotation marks omitted).

The court held that the testimony about the standard of care was admissible because the expert witness was sufficiently qualified to testify about nurses' responsibilities to care for patients. *Id*. However, the testimony concerning causation was excluded because the expert witness was unqualified since "causation is outside her knowledge as an expert witness and such testimony." *Id*. at 767 (*citing Berry*, 25 F.3d at 1350).

Lastly, in *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469 (6th Cir.2008), a motorist sued his vehicle's manufacturer under a product liability statute. The *Sigler* court affirmed the district court's grant of a motion in limine

precluding plaintiff's expert witness, a mechanic, from testifying about accident reconstruction and potential defects in the vehicle because the court concluded the mechanic was not qualified to offer testimony on these issues. *Id.* at 478–79. The court found that "although [the expert witness] appears to be an able mechanic, the substance of his evidence deals with estimating the speed at which [plaintiff's] vehicle was traveling when it struck the tree, a matter of accident reconstruction." *Id.* at 479.

A mechanic—who routinely deals with cars involved in accidents—is not an expert in accident reconstruction, manufacturing or engineering. And Dr. Bragman is not an expert in the treatment, diagnosis, or causation of vascular injuries—even though he routinely sees patients with vascular injures. Similar to the expert witness in *Elksworth*, Dr. Bragman is likely qualified to testify as to what a chiropractor in compliance with the standard of care would do under the circumstances of this case, the general risks of arterial dissection and stroke associated with cervical manipulation. However, he is not qualified to testify about the causal link between chiropractic care and VAD.

"A proffered witness is qualified to give expert testimony if the witness' qualifications provide a foundation for the witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir.1994). Dr. Bragman shows no

relevant experience, skills, or education—other than the fact that he reviewed scholarly articles—in the area of spinal trauma and vascular injuries. His review of those articles and his experience testifying does not demonstrate a foundation of knowledge in this area of expertise.

Because Dr. Bragman is not qualified to testify on causation those opinions will be excluded from trial. However, Dr. Bragman may testify about the standard of care in chiropractic.

Motion in limine no. 5 is **GRANTED**.

**(5) Motion in Limine No. 9 to Limit the Opinion Testimony of Plaintiff's Expert, Dr. Gerald Shiener**

Defendants move to limit Dr. Shiener's testimony and exclude his opinions regarding the "mechanics of chiropractic induced injury," and Plaintiff's physical condition. They say he is unqualified to render such opinions and that his opinions in these areas are unreliable.

Dr. Shiener will proffer testimony as to damages. He produced an expert report detailing Plaintiff's psycho-social and physical issues he observed post-injury He will also offer testimony about mechanics of Plaintiff's injury and Plaintiff's physical condition.

Dr. Shiener has been a medical doctor for more than 45 years. He specializes in patients who have chronic pain and physical illnesses, comorbidities, psychiatry, and brain injuries. [ECF No. 94-21, PageID.5543]. He testified that he sees a lot of stroke patients, neurological patients, and traumatically brain injured patients. [Id]. He has diagnosed and treated strokes on numerous occasions. [ECF No. 94-21, PageID.5549-50]. He testified that has experience and training in the mechanisms of stroke, the effects of stroke and the modalities used to rehabilitate stroke. [Id]. He testified: "I can understand the mechanics of this injury, and how traction on the neck can cause the dissection of the vertebral and carotid arteries." [Id. at PageID.5548]. Dr. Shiener has evaluated the effects of Plaintiff's neurologic condition as well. [Id]. Dr. Shiener is qualified to testify on the mechanics of Plaintiff's stroke and her physical injuries.

Defendants say Dr. Shiener should be precluded from testifying on the mechanics of the stroke and Plaintiff's physical condition because he has not reviewed any of Plaintiff's medical records nor performed a physical examination on her.

Specifically, Dr. Shiener's opinion is that "it doesn't matter how much force" Dr. Ambroski used in her manipulations of Plaintiff's neck in her vertebral artery, it was "sufficient to cause a tear." [ECF No. 94-21, PageID.5550]. However, he admits

that he has no particular understanding of the chiropractic adjustments in this case "beyond the fact that her neck was turned and manipulated as she described" to him. [Id]. His understanding of the adjustments comes solely from what Plaintiff told him during his evaluation and the effects of the chiropractic manipulation on her neurologic condition. [Id]. He did not conduct a physical examination or examine her medical records. [Id]. He used this information to reach a diagnostic impression and a causal description of her "difficulty of living." [Id. at PageID.5551].

Plaintiff described to Dr. Shiener the following physical symptoms that onset after the chiropractic manipulation: numbness and tingling in her face; paralysis in her face; drooling; weakness on the right side of her body; severe pain in her occipital area of her scalp; problems walking; no temperature sensation in the right side of her face; left sided numbness; headaches; and fatigue. [Id. at PageID.5552]. She did not describe how frequent these symptoms were. [Id].

In *Reece v. Astrazeneca Pharms*., LP, 500 F. Supp. 2d 736, 745 (S.D. Ohio 2007) the Court ruled that an expert opinion concluding that an individual with fibromyalgia or chronic pain cannot distinguish such pain from statin-induced pain or that periodic testing could have somehow prevented plaintiff from developing kidney failure. *Id*. The Court reasoned that the doctor does not seek to testify to matters that grow naturally and directly out of research she has conducted

independent of this litigation. *Id*. Further, her expert opinions did not rely on theories regarding chronic pain, the onset of rhabdomyolysis, and the efficacy of periodic testing, or other methods that have been tested or subjected to peer review and publication. *Id*.

Upon review of the symptoms and chiropractic manipulation described by Plaintiff, a mental assessment, and his own medical knowledge and research he does on a regular basis, Dr. Shiener concluded that the chiropractic manipulation contained enough force to tear Plaintiff's vertebral artery. Similar to *Reece*, neither Dr. Shiener's testimony nor his expert opinion contain a discussion of his considerations of other activities Plaintiff participated in that could have traumatized her vertebral artery. And he reviewed no medical testing or other evidence to support his opinion. To the extent that Dr. Shiener offers an opinion on the amount of force used and whether it was sufficient to cause Plaintiff's VAD or traumatize her spine, such opinions are unreliable and not based on sufficient data. *See Pluck v. BP Oil Pipeline Co*., 640 F.3d 671, 678 (6th Cir.2011) (rejecting medical-causation testimony where expert failed to "rule out" alternative causes).

However, he may testify about how chiropractic manipulation could cause the symptoms Plaintiff described if a particular amount of force or trauma was applied to Plaintiff neck. And he may testify about the physical symptoms Plaintiff

described, and their association with strokes or VAD. Such an opinion is not speculative because he reliably reaches this opinion pursuant to his independent medical knowledge, experience, and Plaintiff's psychological evalutation.

To be clear, Dr. Shiener is not permitted to give his expert opinion that Dr. Amrboski used enough force during chiropractic manipulation to tear Plaintiff's vertebral artery or that she caused Plaintiff's symptoms.

Defendants motion in limine no. 9 is **GRANT IN PART and DENIED IN PART**.

## V. Motions in Limine Nos. 6-8 and 10

### A. Motion Limine No. 6 to Exclude Hearsay Testimony

Plaintiff was deposed on June 8, 2020, she testified that her treating physicians told her the chiropractic treatment caused her VAD and stroke. [ECF No. 98-6, PageID.5965]. Defendants seek to exclude that testimony as inadmissible hearsay under Fed. R. Evid. 801-803.

Hearsay is any statement that (i) a declarant "does not make while testifying at the current trial" and (ii) is offered into evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). If a statement meets the definition of hearsay, it is inadmissible, see Fed. R. Evid. 802, unless it satisfies

one or more of the hearsay exceptions or is permitted by federal statute or U.S. Supreme Court rules. see Fed. R. Evid. 803, 804, 807. "The proponent of a hearsay statement bears the burden of proving each element of a given hearsay exception or exclusion." *United States v. Nero*, 598 F. Supp. 3d 568, 570 (E.D. Mich. 2022) (*citing United States v. Day*, 789 F.2d 1217, 1221 (6th Cir. 1986) (internal quotations omitted).

There is no dispute that Plaintiff's statement is hearsay because it is being used to prove that Dr. Ambroski's chiropractic care caused Plaintiff's VAD and stroke. Further the parties agree that there is only one hearsay exception at issue: statements made for the purposes of medical treatment or diagnosis.

Under Fed. R. Evid. 803(4), statements made for and reasonably pertinent to medical treatment or diagnosis that describe medical history; past or present symptoms or sensations; their inception; or their general cause are exempted from hearsay. The rationale behind this exception is that statements made by an individual to physicians for purposes of diagnosis or treatment are considered exceptionally trustworthy because the declarant has a strong motive to tell the truth in order to receive proper care. *White v. Illinois*, 502 U.S. 346, 355–56 (1992).

In *Field v. Trigg Cnty. Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004), the Sixth Circuit held that "the hearsay exception set forth in Fed. R. Evid. 803(4)

applies only to statements made by the one actually seeking or receiving medical treatment." *Field* is binding precedent on this Court.

Plaintiff testified about a statement her physician made to her about the cause of her injuries. Plaintiff argues that *Field* is distinguishable. In that medical malpractice case, a defendant physician sought to testify that two experts from an esteemed medical institution told him while he was treating a patient that his treatment was appropriate. *Field*, 386 F.3d at 736. The court ruled that the statements were not admissible pursuant to the Fed. R. Evid. 803(4) hearsay exception because they were not made by the individual seeking treatment or diagnosis. *Id*. The distinction that Plaintiff points out—that the statement was made by a consulting physician to defendant physician—does not render *Field's* broad holding inapplicable. *See Good v. BioLife Plasma Servs., L.P.*, 2022 WL 17821556, at *4 (E.D. Mich. Dec. 20, 2022) (relying on *Field* and holding that a statement from an unnamed provider diagnosing Plaintiff with a skull fracture did not meet the hearsay exception under Fed. R. Evid. 803(4)). *See also Blosser v. Gilbert*, 422 F. App'x 453, 461 n.2 (6th Cir. 2011) (medical malpractice plaintiff's statements that doctors allegedly made to him about the need for surgery and how he would have received surgery had he visited the specialist on time were inadmissible under *Field* and Fed. R. Evid. 803(4)); and *United States v. Mason*, 294 F. App'x 193 (6th Cir. 2008) (Defendant's psychiatric records were not admissible under hearsay exception for

statements made for purposes of medical diagnosis or treatment, as exception applied only to statements made by the one actually seeking or receiving medical treatment, and statements sought to be introduced by defendant were made by psychiatrist).

*Field's* holding applies with full force here because the statements Plaintiff seeks to introduce are hearsay and were made by her physician, not by her or any other individual seeking treatment. Plaintiff says that the statements should be admitted because the circumstances indicate that it is trustworthy. Even Plaintiff's statements pertaining to what her doctor told her about the cause of her injuries were trustworthy, that does not permit the Court to disregard Sixth Circuit precedent. And Plaintiff cites to authority for such an argument.

Defendants' motion in limine No. 6 is **GRANTED**.

### B. Motion in Limine No. 7 to Bar Reference or Argument to Gross Negligence and/or Intentional Willful, and Wanton Misconduct

Count III of Plaintiff's complaint alleges Gross Negligence/Intentional—Willful—Wanton conduct. Defendants seek to bar reference and argument to the claims made in this count because: (1) gross negligence is not an independent cause of action in Michigan; and (2) there is no factual support for the jury to draw a reasonable conclusion regarding Dr. Ambroski's liability for intentional and wanton misconduct.

Defendants' first argument is correct. The Michigan Supreme Court discarded the doctrine of common law gross negligence, recognizing that it had outlived its practical usefulness. *Jennings v. Southwood*, 446 Mich. 125, 132 (1994). Statutory gross negligence is instead an affirmative defense to be raised by a defendant. *Odom v. Wayne Cty.*, 482 Mich. 459, 479 (2008). Only because a plaintiff must sometimes show gross negligence to overcome immunity, courts have permitted claims styled as gross negligence to go forward under ordinary tort principles. *See, e.g., Holland v. City of Highland Park*, No. 324312, 2016 WL 1072194 (Mar. 17, 2016); *FOLTS v. CIGNA Ins. Co.*, 1999 WL 33438012, at *1, 1999 (Aug. 6, 1999).

Plaintiffs bringing a tort claim must still plead the common law elements of ordinary or professional negligence. *Rakowski v. Sarb*, 269 Mich. App. 619, 627 (2006). *See In re Flint Water Cases*, 384 F. Supp. 3d 802, 872 (E.D. Mich. 2019), aff'd and remanded on other grounds, 960 F.3d 303 (6th Cir. 2020) (Applying Michigan law and concluding: "although plaintiffs style their proposed claim as one of gross negligence, the Court must treat it as one of ordinary negligence."). For these reasons, Plaintiff's gross negligence claim cannot proceed to trial because there is no such thing as a "gross negligence claim" outside the context of governmental immunity under Michigan law.

Defendants' second argument impermissibly invites the Court to weigh the evidence and dispose of Plaintiff's claim pursuant to a motion in limine. They say there is no competent evidence to dispute Dr. Ambroski's testimony that she was a "light adjuster who did not use extension or rotation, two movements that are theorized to contribute to injury." [ECF No. 92, PageID.4347]. The argument continues, "the fact that Plaintiff sustained a dissection cannot be used to imply Dr. Ambroski intentionally used excessive force because Plaintiff's experts admitted excessive force is not even a prerequisite to injury. [Id]. Plaintiff testified about her symptoms, her perception of the cervical manipulations Dr. Ambroski performed, that the second manipulation was more forceful and quicker. Defendants attempt to explain why her testimony is not reliable or sufficient to establish intentional misconduct: because she had little experience with chiropractic care, or her perception may have been influenced in some way. But they do not move to exclude her testimony, they move to bar her claim. These arguments are inappropriate at this stage.

The summary judgment stage of this litigation is long gone. Defendants stipulate to a dispositive motion cut off date that expired on November 1, 2019. Three years have passed since that date and Defendants filed no such motion. [ECF No. 18]. Now they impermissibly invite the Court to determine whether Plaintiff's

claim is supported by evidence and weigh credibility between the testimonies of Dr. Ambroski and Plaintiff.

Whether Plaintiff's claim is supported by evidence is a summary judgment question, not a motion in limine question. In the Sixth Circuit, if a "motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered." *Louzon v. Ford Motor Co*., 718 F.3d 556, 563 (6th Cir. 2013). The U.S. Supreme Court has recognized "[i]n a civil action, the question whether a particular affirmative defense is sufficiently supported by testimony to go to the jury may often be resolved on a motion for summary judgment." *United States v. Bailey*, 444 U.S. 394, 412 n. 9 (1980).

A motion in limine is "any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n. 2 (1984). "Unlike a summary judgment motion, which is designed to eliminate a trial in cases where there are no genuine issues of material fact, a motion in limine is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ*., 913 F.2d 1064, 1069 (3d Cir.1990). Allowing a party to litigate matters that have been or should have been resolved at an earlier stage deprives their opponents of the procedural protections that attach at summary judgment. *Louzon*, 718 F.3d at 561.

For these reasons, motion in limine no. 7 is **DENIED IN PART and GRANTED IN PART.** Plaintiff's gross negligence "claim" is dismissed.

### C. Motion in Limine No. 8 to Bar All Claims Not Causally Linked to Harm

Defendants again attempt to raise summary judgment issues at this late stage in litigation as part of a motion in limine. They say, "there is no evidentiary support for the theory that any aspect of Dr. Ambroski's care of Plaintiff on July 20, 2016 proximately caused harm and any argument that it did must be barred." [ECF No. 92, PageID.4350]. Plaintiff testified that about the temporal link between the chiropractic manipulation, her VAD and stroke, the amount of force used, and several experts opined that Dr. Ambroski caused Plaintiff's VAD. However, even if the record was absent of evidence pertaining to causation, it is too late for Defendants to move for summary judgment.

For the reasons stated above with respect to Defendants second argument in motion in limine no. 7, motion in limine no. 8 is **DENIED**.

### D. Motion in Limine No. 10 To Bar Argument or Reliance On the Doctrine of Res Ipsa Loquitur

Defendants move to bar Plaintiff's res ipsa loquitur claim because she presents evidence that the amount of force used by Dr. Ambroski in her manipulation of Plaintiff's spine caused her injury.

Michigan law applies in this diversity case. The Michigan Supreme Court has held repeatedly that "res ipsa loquitur refers to circumstantial evidence of negligence where the specific incidence of negligence cannot be identified." *Jones v. Porretta*, 428 Mich. 132, 150 (1987); *Cox ex rel. Cox v. Bd. of Hosp. Managers for City of Flint*, 467 Mich. 1 (2002). "The major purpose of the doctrine of res ipsa loquitur is to create at least an inference of negligence when the plaintiff is unable to prove the actual occurrence of a negligent act." *Gordon v. Flynn*, 2015 WL 3872239, at *3 (Mich. Ct. App. 2015).

In order to avail herself of the doctrine of res ipsa loquitur, Plaintiff must meet the following conditions: (1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff; and (4) evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff. *Woodard v. Custer*, 473 Mich. 1, 8 (2005).

This is not a res ipsa loquitur case because the specific negligent act is known to Plaintiff. Plaintiff alleges that Dr. Ambroski caused her injury by using excessive force in her chiropractic manipulations.

Further, applying the factors, all of Plaintiff's experts have testified that VAD may occur due to any trauma to spine or neck, even if it is slight. This means that both negligent forces and non-negligent forces have a likelihood of causing VAD. It is true that Plaintiff's allegations point to Dr. Ambroski's chiropractic methods as the instrumentality within the exclusive control of the defendant which caused her injury. And Plaintiff denies that her injuries were due to any voluntary action or contribution on her part. Finally, however, Plaintiff cannot say that evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff. Plaintiff has a viable explanation for her injuries that implicates Dr. Ambroski's allegedly negligent excessive force she applied in giving Plaintiff chiropractic care and failing to obtain Plaintiff's informed consent.

Defendants' motion in limine no. 10 is **GRANTED**.

### E. Motion in Limine no. 12 to Preclude Vouching for Plaintiff's Credibility.

Defendants seek to preclude Plaintiff's counsel from making statements during argument that vouch for the credibility of Plaintiff. Plaintiff's counsel argues that they can address Plaintiff's credibility via argument. They rely on the comment to M CIV JI 4.10, which allows certain factors pertaining to an expert witness's testimony to be addressed on argument of counsel. These factors include: the length and diversity of the witness's experience; the professional attainments of the

witness; whether the witness is regularly retained by diverse, responsible persons and thus has a widespread professional standing to maintain; and the experience that the witness has had in dealing with the nature of the issue about which [ he / she] has testified. Id.

Clearly, this jury instruction has nothing to do with a plaintiff's credibility and Plaintiff counsel cites no authority that permits them to admit testimony in during argument that vouches for Plaintiff's credibility.

Defendant's motion in limine no. 12 is **GRANTED**.

## VI. Conclusion

For the reasons below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**:

**No. 1:** Motion to Preclude Evidence of Claims for Lost Wages and/or Loss of Earning Capacity is **DENIED IN PART AND GRANTED IN PART.**

**Nos. 3-5 and 9:**

- Defendants' Motion to Exclude Causation Testimony of Plaintiff's Expert Robert E. Lee ("Dr. Lee") is **DENIED**

- Defendants Motion to Exclude Causation testimony of Chitra Venkatasurbramanianm ("Dr. Venkat") is **DENIED**

- Defendants' motion to exclude causation opinion of Alan Bragman ("Dr. Bragman") (5) is **GRANTED**.

- Defendants' motion no. 9 to exclude Gerald Shiener ("Dr. Shiener") is **GRANTED IN PART AND DENIED IN PART.**

**Nos. 7-8, 10, and 12**:

- Defendant Motion in limine No. 7 is **GRANTED IN PART and DENIED IN PART**;
- Defendants Motion in limine No. 8 is **GRANTED**;
- Defendant Motion in limine No. 10 is **GRANTED**
- Defendant's Motion in limine no. 12 is **GRANTED**.

**IT IS SO ORDERED.**

Dated: January 19, 2023

/s/ Gershwin A. Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on January 19, 2023, by electronic and/or ordinary mail.
/s/ Teresa McGovern
Case Manager